**KIRSH NOVELTY CO., Inc., v. MID-AT-LANTIC GLASS CO.**

Civil Action No. 64–F.

District Court, N. D. West Virginia.

April 3, 1946.

William Bruce Hoff and Harry O. Hiteshew, both of Parkersburg, W. Va., for plaintiff.

Ernest R. Bell and L. T. Eddy, both of Fairmont, W. Va., and Harry E. Moats, of Harrisville, W. Va., for defendant.

HARRY E. WATKINS, District Judge.

Plaintiff is a New York corporation, and a jobber in bar glassware. It has brought this action against defendant, a West Virginia corporation, which manufactures bar glassware, to recover damages for alleged breach of contract in filling orders placed by plaintiff with defendant. The jury returned a general verdict in favor of defendant, disallowing any recovery to plaintiff and awarding defendant damages in the amount of $1622.94 on its counterclaim. Plaintiff has moved to set aside the general verdict of the jury and the judgment entered thereon, to set aside the jury's answer to Interrogatory No. 2, and to enter judgment for plaintiff on its first cause of action, and, in the alternative, for a new trial as to such cause of action.

Three causes of action are set out in the complaint. No evidence was offered by plaintiff as to the third cause of action, and the court directed the jury to find for defendant thereon. The jury found for defendant as to the second cause of action, and this action is not here questioned. In addition to the general verdict, the jury, at the direction of the court, answering the first of these interrogatories, found that there was a completed contract between plaintiff and defendant binding the defendant to deliver the glassware mentioned in plaintiff's first cause of action at some future time. By its answer to the second interrogatory, the jury found that defendant did not breach such contract, before there was a breach thereof by plaintiff. Since plaintiff admitted that it had received from defendant merchandise of the value of $1622.94, for which it had not paid, the jury awarded defendant a verdict for that amount upon its counterclaim. The court is now asked to set aside the answer to this second interrogatory, and to hold that, as a matter of law, the jury was wrong in finding that defendant did not first breach the contract. This presents the single question as to the sufficiency of the evidence to support this finding of the jury.

Plaintiff was a jobber in New York City. Defendant was a co-operative company, with stockholders who were glassworkers in its manufacturing plant. Plaintiff began to do business with defendant about 1939. The first cause of action relates to 149 separate orders placed with defendant between July 24, 1943, and April 21, 1944. There was no over-all contract between the parties. The manner of doing business consisted in taking orders and shipping merchandise. These orders were in writing and specified the kind, type, and quality of glassware to be shipped. There was nothing on the orders showing any conditions or any time at which the merchandise was to be shipped. These matters were discussed in many oral telephone conversations and in correspondence between the parties.

During the year 1942 defendant's facilities for the manufacture of glassware became greatly restricted due to the World War. It was unable to get labor and materials. These conditions grew increasingly worse. By the end of 1942, labor conditions, shortage of manpower, difficulty in obtaining raw materials, the drafting of employes into the military service, and the loss of employes to defense plants, made it apparent to defendant that it would not be able to guarantee any specified deliveries of any of its product to any of its customers. Accordingly defendant notified its various customers, including plaintiff, that thereafter it would not guarantee the delivery of its product or any quantity thereof which might be ordered from it. It notified plaintiff and its other customers that

the only undertaking it would thereafter assume, was to do the best it could under the circumstances in the manufacture and delivery of its glassware. This notice to plaintiff was contained in a letter dated January 19, 1943, and was received by plaintiff more than five months before plaintiff placed any of the orders in suit. That letter follows:

"Dear Mr. Kirsh:

"I have neglected to write to you about the second punch shop because I didn't have anything definite to write. We have the punch blower and a boy trying to gather for him, the only thing they can make is shell tumblers. We have been unable to get a good punch gatherer, they are all working at good jobs in defense and they won't make a change. However, we can use a little more punch with the present setup, these are war times and nothing is certain, our labor situation is bad as men come and go all the time. Many of them live so far from the factory they can't get to work when the weather is bad. There is an average of one shop off a day because of lack of boys, however we are making the best of the situation.

"I was at the glass show in Pittsburgh and it was the biggest show in dollar and cents in twenty three years. Lots of business, but no guarantee of deliveries. We have notified all of our buyers that we will give them the best service we can this year, whatever that may be we do not know, this includes you people. We will not commit ourselves to any certain amount per week as we cannot do it honestly to anyone. People who buy bar ware from you just as well be notified that they will not get the same service they got before the war. We do not get prompt deliveries on raw materials, boxes, ect., but it is a situation that cannot be helped. We will do the best we can for you this coming year and only hope you do the same for us.

"Very truly yours,
"Mid-Atlantic Glass Co.
"Sales Manager."

As early as November 24, 1942, defendant wrote to plaintiff stating that plaintiff should "keep your stock up as best as you can because anything is liable to happen." Again on December 21, 1942, defendant wrote to plaintiff stating that all labor was very independent since the war, and stating that the defendant company could not force a worker to transfer over from one department to another. The stem shop made expensive ware and the wages there were higher than in the punch shop where the cheaper ware (such as the bar ware ordered by plaintiff) was made.

As the shortage in consumer goods increased, the demand increased. Plaintiff had many orders but defendant was unable to deliver the glassware. Plaintiff did not like this slowness and uncertainty in filling orders, and from the beginning insisted that defendant agree to ship it a specified amount of ware each week. This defendant repeatedly refused to do, with the result that plaintiff made many telephone calls from New York, insisting that it receive more ware, and, if necessary, transfer men from other shops, or transfer men working on other orders to their orders. Defendant continued its series of letters, explaining why it could not guarantee deliveries. On May 11, 1943, more than two months before the first of the orders in dispute were sent in, the defendant wrote to plaintiff, in part, as follows: "We have orders placed over two months old and no deliveries yet. This not only affects you but all our customers. We are doing the best we can. Your customers will just have to wait for their glass like we do the boxes we put them in. Also we have tried to carry on and paid large prices for boxes and wages until we cannot take it any longer. I am sorry this has to be done, but there is a limit to everything." Since there is no over-all contract these letters and these conversations are important because they show the very limited promise which defendant made with reference to future delivery.

After receiving these letters plaintiff forwarded to defendant the various orders involved in this action. Those orders mentioned in the first cause of action were sent to defendant during a period of about one year and amounted to about $25,000. Some $10,000 of the orders were filled by defendant over this period. The orders sued on were partly filled and others were not filled at all. Of the $15,000 in unfilled orders plaintiff contends that it would have made a profit by re-sale of $8,270.92 and asks for judgment for that amount in its first cause of action.

Conditions were getting worse at the plant so far as labor and war conditions were concerned. In order to satisfy plaintiff, at times defendant took men from other orders and placed them on plaintiff's busi-

ness. Upon plaintiff's insistence, at other times, defendant transferred men working on more expensive ware, where their wages were high, to cheaper bar ware ordered by plaintiff, where wages were much lower, despite the fact that unfilled orders were on hand for the better type of ware. These employes complained and stated that they would not continue the practice of giving up their higher wages on orders on hand and work on cheaper ware. The defendant asserts that if it continued to transfer workmen in this manner it would lose all its employes, and would find itself out of business.

By April 23, 1944, defendant's facilities for the manufacture of this type of glassware were such that it felt that it could not accept any more of these orders. On that day a meeting of stockholders was held at which future business was discussed, and it was decided that the company should not accept any more new orders. On April 24, 1944, Games, its sales manager, wrote the following letter:
"Dear Kirsh:

"We stockholders held a meeting last night and it was a very lengthy one. Here is what we are going to do. Not make any more stemware and tumblers for any of our customers, cutting and bar alike. If we are in business at the end of this year, the way things are going, it will be because we have taken this step. If we continue the way we have been, we are going to lose our shirt.

"Our production is cut fifty percent. We have only five shops and sometimes we can't get help for these. We cannot absorb the extra costs any longer. We will have to make items that we can sell for a price to offset the added costs.

"I was on the road all last week seeing our customers and telling them the same as I am telling you. I hate to do this Kirsh, but we have to take a stand before it is to late.
      "Very truly yours,
          "Mid-Atlantic Glass Company
              "Lloyd Games
                  "Sales Manager.
"LWG:LMM."

Between April 20, 1944, and April 26, 1944, plaintiff sent in many new orders (listed in plaintiff's second cause of action) which defendant refused to accept. Defendant contends that this letter referred to new business only, and was so understood by the plaintiff, as shown by its subsequent telephone conversation.

Upon receipt of this letter the two Kirsh brothers called the defendant by telephone and talked to Games. There is a conflict in the evidence as to what was said. Games testified that the conversation related only to the new orders which had come in since April 20 (the subject of cause of action No. 2), and nothing was said about the old orders; that the Kirsh brothers wanted them to reconsider their decision with reference to this new business, and send the plaintiff a telegram after he had "taken the matter up with the boys." The Kirsh brothers testified that the conversation related to old orders and new orders were not mentioned. At any rate Games took the matter up with his associates concerning these future orders and then sent the following telegram on April 27, 1944:

"After our phone conversation I talked to the stockholders and they say stem ware and tumblers is out definitely before it is too late I'm sure your trip will not change their minds."

Upon receipt of this letter one of the Kirsh brothers again called the defendant by telephone and again there is a dispute as to what was said. Games testified that Kirsh made inquiry as to the old orders and was told that Games would call a meeting and then write him a letter. Games says that this was the first conversation in which the old orders were discussed. Such a meeting was held on April 30, and on May 1 the following letter was sent:
"Dear Kirsh:

"The stockholders held a meeting last night and I told them what transpired in our telephone conversation. Here is their decision. We are returning orders not accepted as follows:

| #476 | #491 | #498 | #506 | #510 |
|------|------|------|------|------|
| 477  | 492  | 501  | 507  | 511  |
| 478  | 493  | 502  | 508  | 512  |
| 479  | 494  | 503  |      | 513  |
| 480  | 495  | 504  |      | 514  |
| 481  | 496  |      |      |      |
| 482  |      |      |      |      |

"The balance of orders that we have accepted and are on file will be made up as soon as our present setup and production will permit. The reason we are doing this is explained in my letter of April 24, 1944.

"I am sorry but the war has made many changes and there is nothing we can do about it.

"Very truly yours,
"Mid-Atlantic Glass Company
"Lloyd ·Games
"Lloyd Games
"Sales Manager
"LWG:LMM."

After this letter of May 1, the defendant did continue to make ware that would fit into the old orders. This undisputed fact is important in showing that it was defendant's intent at this time to fill plaintiff's old orders as soon as circumstances would permit.

On April 24, 1944, plaintiff owed defendant $1622.94 for ware already delivered, and had given two checks on such account. On May 4, 1944, plaintiff's attorney, Benjamin S. Kirsh, wrote defendant that payment had been stopped on these two checks and threatening to sue defendant for breach of contract. Payment was stopped on both checks. Defendant's attorney replied on May 6 to the effect that he finds that there was no agreement on the part of defendant to deliver any certain amount of glassware to plaintiff. He further states:

"I regret to hear that you have stopped payment on the two checks to Mid-Atlantic Glass Company for ware heretofore delivered to your company. Our company had seven or eight hundred dozen pieces of ware in its shipping room ready to ship to your company when your letter reached them advising them of the stopped payment on the two checks. Our company will certainly not ship this ware to your company until a certified check is received for the ware already delivered and not paid for by your company. Unless we hear from you within the next few days, we will dispose of this ware to other buyers."

As late as May 10, defendant was still continuing the manufacture of this bar ware to fill old orders. The sales manager testified that if those checks had not been cancelled, the defendant "would have kept on filling his old orders." About May 9 or 10 one of the Kirsh brothers called Games on the telephone and a heated argument followed concerning the cancelled checks. Kirsh wanted to meet and iron out the differences. Games promised to again take the matter up with the stockholders, which he did, and on May 10 wrote the following letter:

"Dear Kirsh:

"I talked to the stockholders about our telephone conversation. Here is their reaction. We had several hundred dozen of your ware to ship last week to help fill your orders, but when the letter arrived with the stop payment on those two checks that was the last straw. You had over stepped your rights, keeping the ware and the money both.

"Owing to the feeling of not paying for that ware it would be useless for us to get together, as we don't ship ware to people who don't pay their bills.

"Very truly yours,
"Mid-Atlantic Glass Co.
"Lloyd Games
"Sales Manager
"LWG:LMM."

As late as May 16, 1944, plaintiff was still insisting that it was entitled to have its old orders filled by shipment of a definite and specified number of dozen per week, as indicated by letter from their attorneys to the attorney for defendant under date of May 16, 1944, in part, as follows:

"It would seem to us that this matter should adjusted on an amicable basis. Naturally our client is desirous of paying these checks on which it stopped payment. Your client knows this, it has trusted us for many times this amount in cash as well as credit. But we are entitled to an assurance from you that these orders will be shipped at a specified number of dozen per week until they are all cleared up."

On May 24, 1944, the attorney for defendant wrote attorney for plaintiff to the effect that the defendant denied that it had ever accepted any orders binding it to deliver such merchandise, and stating as follows:

"On the second page of your letter you state that we intimate that we intended to fill accepted orders or orders on hand after the outstanding checks were paid. Please let me make it clear that we had no intention to intimate such. We know, as you know, that there is no legal liability on our part for not filling orders that are sent to us, whether we confirm their receipt or otherwise." * * *

Several witnesses for defendant testified that they attended the meeting of the stockholders of the defendant company held on April 23, 1944, at which it was decided not to take any future orders for this type of ware. These same witnesses testified that

again on April 30 they attended a meeting at which the old business was discussed and at which it was decided to make up the old orders but send all new business back. It is clear from this evidence that whatever ambiguity may have been contained in the letter of April 24, or the telegram of April 27 prepared by Games, or whatever understanding may later have existed in the mind of counsel, it was the intention of the stockholders present at these meetings to fill the old orders when circumstances would permit, but not take any more new orders. This is made crystal clear in defendant's letter of May 1 wherein plaintiff was told that "The balance of orders that we have accepted and are on file will be made up as soon as our present set-up and production will permit." If plaintiff had understood the previous correspondence and telephone conversation, to express the opposite intent on the part of defendant not to make up these back orders, it would have been a simple matter for plaintiff to have paid its outstanding checks and received the ware covered by the old orders, much of which was then in stock ready to be shipped and other similar ware being produced. Whatever misunderstanding plaintiff might have had as to defendant's intentions with reference to old orders, was definitely eliminated by that letter of May 1. The jury was amply justified in believing plaintiff was not satisfied with a mere promise to deliver its ware as speedily as circumstances would permit, but wanted to exact a promise from defendant to deliver a specified number of dozen of ware each week, regardless of existing conditions. This intent was expressed in its numerous long distance telephone calls. This was the purpose of a visit to the plant in West Virginia by the two Kirsh brothers in January, 1944, when they tried to secure a definite promise for delivery of 1200 dozen of ware per week. As the result of this visit the defendant did take men from other work and did step up the completion of plaintiff's orders, but refused again to guarantee any deliveries. This is the intent expressed in the letter of plaintiff's attorneys, dated May 16, 1944, in which a settlement is suggested, upon the condition that these old orders are shipped at a specified number of dozen per week until they are all cleared up.

Besides the written evidence, there was an abundance of oral evidence such as telephone conversations in explanation of letters, and in most instances the evidence is in sharp conflict. Representatives of both plaintiff and defendant discussed these matters and their respective understanding and intent both in New York and at the plant, and much of this evidence is in conflict. The credibility of witnesses for both parties was attacked. The jury saw them face to face and heard all of this testimony. Plaintiff's theory of the case was fully explained to the jury in the court's charge. Under these circumstances the finding and verdict of a jury should not be disturbed unless manifest wrong and injustice have been done, or unless the verdict is plainly not warranted by the evidence. It seems to me that the case presented a jury question; and that there is an abundance of evidence to sustain both the finding and verdict of the jury. Plaintiff's motion to set aside the verdict and finding of the jury and any judgment entered thereon, and to enter judgment for the plaintiff as to the first cause of action is overruled. Plaintiff's alternative motion for a new trial is also denied.